**Edward SCHOCK and Sharon Schock, Plaintiffs and Respondents,**

v.

**NORTHERN TANK LINE, INC., Defendant and Appellant.**

**Jerry BROOKS, Plaintiff and Respondent,**

v.

**NORTHERN TANK LINE, INC., Defendant and Appellant.**

**Civ. Nos. 8787 and 8788.**

Supreme Court of North Dakota.

March 28, 1972.

Conmy, Conmy, Rosenberg, Lucas & Olson, Bismarck, for defendant and appellant.

Frederick E. Saefke, Jr., Bismarck, for plaintiffs and respondents.

ERICKSTAD, Justice.

Appeals have been taken to this court from separate judgments against the defendant Northern Tank Line, Inc., entered in the District Court of Morton County in connection with causes of actions which were consolidated for trial and which are

being considered together on appeal. A trial de novo is demanded in each case.

The actions arise out of a collision which occurred between the automobile driven by Edward Schock and a tractor pulling a tanker driven by Mr. Mahoney, an employee of the defendant. We shall hereinafter refer to the defendant as Northern and the tractor and tanker as the tanker.

The collision occurred at about 9 a. m., December 6, 1969, on North Dakota Highway No. 6, approximately twenty miles south of the city of Mandan. Mr. Schock's wife, Sharon, was a passenger in the right front seat, and Mr. and Mrs. Jerry Brooks were passengers in the rear seat of the 1966 Starfire Oldsmobile automobile owned by the Schocks. Mr. Brooks was seated on the right side and Mrs. Brooks on the left side. All four were from McLaughlin, South Dakota, and at the time of the collision the Schock vehicle was proceeding north on Highway No. 6.

At about 1:45 that morning, the tanker had stalled just a short distance north of the place where the collision occurred, and as a result of the stalled condition of the tanker the driver had sought help from Northern's home office in Mandan, and that office had sent its employee Mr. Kroh with a pickup truck to the scene several hours later. After Mr. Kroh assisted Mr. Mahoney in placing chains on the tires of the tanker, the two drivers commenced to drive their respective vehicles up an incline to the south. At about that time the Starfire driven by Mr. Schock came over the crest of the hill from the south. The collision occurred approximately 750 to 1,-000 feet north of the crest of the hill.

The trial court, sitting without a jury, awarded damages in the sum of $100 to the plaintiff Edward Schock and damages in the sum of $2,507.15 to the plaintiff Sharon Schock, together with their costs and disbursements. The court awarded the plaintiff Jerry Brooks damages in the sum of $2,687.50 plus costs and disbursements.

No issue has been made as to the amou. of the damages in either case, it being asserted on the other hand that the evidence is insufficient to sustain the court's findings that the claims of the various plaintiffs were a result of a negligent act of Northern's employees which contributed proximately thereto. Northern further contends that had the court properly applied the "sudden-emergency" doctrine to the acts of its employees, it could not have found it liable.

The pertinent finding of the trial court is that Northern, through its employees, negligently blocked and occupied the traffic lane which was being properly used by the Starfire driven by Mr. Schock, and that blocking of the traffic lane was the proximate cause of the plaintiffs' damages.

It is Northern's contention that both of its vehicles were in the proper southbound lane until just before the collision, when Mr. Kroh, in order to avoid being hit by the Starfire, which he asserts was traveling toward the pickup in the southbound lane, steered the pickup to the southeast and thus into and across the northbound lane.

It is to be noted that the collision did not occur between the pickup and the Starfire, but that it occurred between the Starfire and the tanker in the tanker's southbound lane of traffic.

Edward Schock, the driver of the Starfire, testified that as he drove north over the crest of the hill he saw the tanker in the opposite lane of traffic, approximately 200 to 250 yards (600 to 750 feet) ahead, and that as he proceeded down the hill he became aware of the pickup in the northbound lane beside the tanker, which was in the southbound lane. It was his impression that both vehicles were standing still at that time.

Jerry Brooks, a passenger in the right rear of the Starfire, said that it appeared to him at first sight that the pickup was alongside the tanker, near the cab door, and that both vehicles were standing still.

Mr. Schock said that when he noticed that the pickup was having difficulty moving forward on the ice, he drove over to the west lane, expecting to move back to his proper driving lane after the pickup was far enough ahead of the tanker to leave a space for his car to go through. He said the automobile was traveling between 40 and 45 miles per hour when it crested the hill.

Mr. Robert W. Senger, the State Highway Patrolman, testified that at the scene of the accident the ditches on both sides of the highway were fifty feet deep.

Mr. Schock said that when he saw the tanker in the west lane and the pickup in the east lane coming along side by side, to avoid sliding upon the ice he shifted the car into a lower gear to slow down, which caused the rear of the car to swerve toward the east, but that he was able to correct the swerve immediately. He did not apply his brakes, because of the icy surface of the road, until he reached a patch of gravel, which was between 50 and 75 feet long. While traveling over the gravel he applied his brakes and again shifted into the next lower gear, which again caused the car to swerve. He was again able to correct the swerve.

Mr. Brooks said that he could feel the effect of the application of the brakes on the gravel and was able to feel the shifting of gears.

Mr. Schock testified that after leaving the gravel and shifting into the next lower gear, he pushed his wife back in the seat from where she was braced against the the dashboard and at about that time he applied his brakes and skidded sideways into the tanker.

Mr. Kroh, the driver of the pickup, testified that he was never alongside the tanker, although he did identify the tire tracks in a photograph taken by the patrolman as belonging to the pickup he was driving. These tire tracks appear to be in a considerable distance from the west shoulder of the road and ultimately turn to the east shoulder of the road.

Mr. Mahoney, the tanker driver, testified at length concerning the difficulties of the pickup on the ice, but maintained that the pickup was on its proper side of the road until forced to go to the left, or east, side to avoid being hit by the oncoming car.

He testified as follows in response to a question as to what transpired:

"A. Well, he couldn't get started right away, it was spinning and slipping around, and he backed up against my truck.

"Q. Stop there. Which lane of highway six (6) was he in at that time?

"A. He was right on the shoulder, right directly in front of me at that time.

"Q. When he backed up?

"A. Right.

"Q. What happened then?

"A. Then he put it in second or third gear, I don't know which, to see if he could get started out of there. He got rolling then after he was I put mine in gear and started up the hill behind him, right on the shoulder of the road.

"Q. Did this still, did you still have an opportunity to observe the pickup?

"A. Right.

"Q. How far in front of it—How far in front of you was his pickup when you started moving?

"A. Oh, I would say around ten (10) feet.

"Q. Which lane of traffic was the pickup in?

"A. Right lane.

"Q. Would that be the west lane?

"A. Right.

"Q. What happened then?

"A. Well he spun out then with the pickup, he couldn't move, so he started backing down again and I stopped.

"Q. What do you mean, spun out?

"A. He couldn't pull it, his wheels were spinning.

"Q. What happened then?

"A. So he started working himself out on to the highway, on an angle, cutting out.

"Q. At that point, was he still on the shoulder?

"A. Right.

"Q. Go ahead?

"A. And he got out on to the main part of the highway and started spinning and sliding and he got another, maybe ten (10) feet, and I kept creeping along behind him.

"Q. All right?

"A. And then he couldn't make it again, so that then he backed up again.

"Q. Did you stop when he backed up?

"A. Right.

"Q. Go ahead, what happened then?

"A. So then he started out again, started spinning and sliding, and he was—just couldn't make it up there.

"Q. Was the back end of the pickup moving?

"A. Right.

"Q. Was he still in the west lane of that highway?

"A. Right.

"Q. Go ahead, what happened after that?

"A. And then I just sat there. I had moved about the length of the tanker, about fifty (50) feet, and I stopped and left her set there.

"Q. What happened then?

"A. Waited for him to get out of my way. Came on the road a ways and had taken off again.

"Q. Did you see any other vehicle about that time?

"A. Then about that time a car broke over the south of the hill and when he was out on the driving lane.

"Q. Stop there now. You saw a car, on-coming car break over the hill?

"A. Right.

"Q. And do you recall of the location of that car on the roadway? Could you tell where it was on the roadway?

"A. Well, I didn't pay too much attention to what—I am pretty sure it was on the right, on its own lane.

"Q. You saw the car coming toward you then?

"A. Right.

"Q. Where was Mr. Kroh in the red pickup at that time?

"A. He was right out in the lane of traffic.

"Q. Which lane?

"A. On the right side, right on the, just about on the centerline.

"Q. Was he over the centerline?

"A. Well, heading southeast, at that time he wasn't."

Mrs. Regina Gangl, a lady who lived on a farm near the scene of the accident, testified that she observed the truck drivers from time to time while they were putting on chains and that the pickup was at all times parked in front of the tanker on the west side of the road. She did not see the pickup at the time of the collision.

Since Northern contends that had the trial court properly applied the sudden-emergency doctrine, it would have been absolved of any liability arising out of the

negligence of the driver of the pickup in driving on the east lane of the highway while proceeding in a southerly direction, we must discuss the applicability of that doctrine in this case.

■ In Tennyson v. Bandle, 181 N.W.2d 687 (N.D.1970), this court accepted the sudden-emergency doctrine as stated in 61 C.J.S. Motor Vehicles § 460, p. 35, as follows:

> "Where a traveler upon or across a highway is confronted by a sudden emergency created by the negligence of another and not by his own fault, he is not held to the same degree of care and prudence as is ordinarily demanded of a person who has time for deliberation and the full exercise of his judgment, and he is not guilty of contributory negligence if he acts as an ordinarily prudent person would act under like circumstances."

In applying the doctrine in *Tennyson*, this court said:

> "Of course, every unexpected occurrence does not constitute a sudden emergency. It must not be a situation which the party claiming the benefit of the 'sudden emergency' rule helped to create." Tennyson v. Bandle, 181 N.W.2d 687, 691 (N.D.1970).

■ Giving the trial court's findings appreciable weight, we conclude that the emergency that confronted the driver of the pickup was one which he helped create and that, therefore, his negligence in driving the pickup into the lane of the oncoming automobile cannot be excused.

It appears to us that the trial court applied the doctrine of sudden emergency to excuse the alleged negligence of the driver of the automobile, but declined to apply it to the negligence of the driver of the pickup. This was proper if the conduct of the driver of the Starfire did not help create the emergency and the conduct of the driver of the pickup did help create the emergency. In coming to such a conclusion, the trial

court had to accept the testimony of some of the parties and reject some of the testimony of others. It was in a better position to determine the basic facts than we are since the witnesses appeared in person before it and we have only the record before us.

In another negligence action involving a collision of motor vehicles, we said:

> "Where an appeal is taken pursuant to Section 28-27-32, N.D.C.C., and the appellant demands a trial anew the findings of the trial court must be given appreciable weight by the Supreme Court, especially when based upon testimony of witnesses who appeared in person before the trial court." Chambers v. Satrom, 154 N.W.2d 913, 914, Syl. 1 (N.D.1967).

■ Accordingly, giving the trial court's findings appreciable weight, we conclude that its findings were basically correct and that the judgments based thereon should be affirmed. The judgments appealed from are therefore affirmed.

STRUTZ, C. J., and TEIGEN, PAULSON and KNUDSON, JJ., concur.